**SIGNED THIS: December 6, 2024**

_____
**Peter W. Henderson
United States Chief Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| **In re:** | |
| **Maria A. Karpuleon,** | **Case No. 24-80647** |
| Debtor. | |

**OPINION**

     Maria Karpuleon, the Debtor, filed in this case her fourth Chapter 13 bankruptcy petition in four years. Each of the petitions had the effect of forestalling imminent foreclosure sales of her home. U.S. Bank Trust National Association, the mortgagee on the residence, has moved for an order under 11 U.S.C. §362(d)(4) for *in rem* relief from the automatic stay for a period of two years with respect to the Debtor's residence so that the foreclosure process may come to an end. Such relief is appropriate only if the Court finds that the filing of the latest petition was part of a scheme to delay, hinder, or defraud creditors that involved multiple bankruptcy filings. Because the latest petition was filed in bad faith as part of a course of conduct intended to improperly delay the

1

Bank from realizing its rights under bankruptcy and nonbankruptcy law, it was filed as part of a scheme to delay, hinder, or defraud the Bank. *In rem* relief from the automatic stay is therefore appropriate.

The Court has subject matter jurisdiction under 28 U.S.C. §1334(a) and ILCD LR 4.1. This is a core proceeding. 28 U.S.C. §157(b)(2)(G).

I.    **The Debtor has filed four Chapter 13 bankruptcy petitions in four years.**

The Court makes the following findings of fact based upon the evidence admitted at an evidentiary hearing held on November 18, 2024, including the Debtor's sworn testimony.

A.    **The first Chapter 13 case**

Foreclosure proceedings began on the Debtor's Mapleton, Illinois home in 2017. By September 2019, a judgment of foreclosure and sale was entered in state court. A sale of the property was scheduled for January 13, 2020. Three days before the scheduled sale, the Debtor filed her first Chapter 13 petition in Case No. 20-80037. Her schedules indicated that she did not earn wage income but was expecting to receive Social Security benefits beginning in February 2020. Her monthly income amounted to $3,270. Accounting for expenses, she listed a monthly net income of $858. The Debtor now disputes that figure, testifying that her Schedule J (expenses) was inaccurate, notwithstanding her sworn declaration at the time to its accuracy.

Given her lack of much income, the Debtor proposed in her Chapter 13 plan to make payments of $100 for 60 months for a total of $6,000. That payment proposal was deficient for two reasons. First, it did not come close to paying the claims in the plan, including in particular the $70,411.52 mortgage arrearage, see 11 U.S.C. §1322(b)(3). Second, it did not satisfy 11 U.S.C. §1325(a)(4), which requires that unsecured creditors receive at least what they would have received in a Chapter 7 liquidation; the Debtor estimated that amount to be $40,000. The Debtor proposed solving both problems by (1) selling real property located in Sahuarita, Arizona, and paying the net amounts into the plan; and (2) applying the proceeds from a pending personal injury lawsuit to the plan. She estimated the Arizona property to be worth $45,000; no value was placed on the personal injury claim. No motion to sell was ever filed, though, and the case was dismissed on the Debtor's motion, which asserted no reason for the dismissal, in July

2

2020.[1] While the first bankruptcy case was pending, the Debtor did make her regular mortgage payments each month from February to July 2020.

### B. The second Chapter 13 case

After July 2020, though, the Debtor again stopped making mortgage payments. The Bank resumed prosecuting its foreclosure action, and a sale of the property was scheduled for September 27, 2021. Three days before the scheduled sale, the Debtor filed her second Chapter 13 petition in Case No. 21-80681. Her monthly income (totaling $2,562) again consisted mostly of Social Security benefits, with an additional $300 from dog-sitting and $400 from "use of vehicle." In her confirmed plan, she agreed to cure the mortgage arrearage (which at this point was $88,947.80) and to maintain post-petition mortgage payments through monthly plan payments of $3,225. Given her lack of sufficient income to pay all the claims in her plan, she again agreed to sell the Arizona property and to apply the sale proceeds to the plan.

The case was ultimately dismissed for non-payment on the Trustee's motion in August 2023. No motion to sell the Arizona property was ever filed. In the two years during which the case was pending, the Debtor paid a total of $23,375 in plan payments, or about one-third of the amount that should have been paid under the plan over those two years. $6,000 was applied towards attorney and Trustee fees; the remainder was applied almost entirely to post-petition mortgage maintenance payments. A mere $63.66 was applied to the mortgage arrearage. After the case was dismissed, the Debtor stopped making mortgage payments.

### C. The third Chapter 13 case

The Bank returned to state court, and a sale of the residence was scheduled for December 11, 2023. Three days before the scheduled sale, the Debtor filed her third Chapter 13 petition in Case No. 23-80898. She still earned no wage income, but in addition to her monthly Social Security benefits ($2,036), she received $255 in Link benefits, $1,000 in rental income from tenants, $400 for dog-sitting, and $425 from donating plasma. She proposed making monthly plan payments of $2,665 in addition to applying the proceeds of the sale of her Arizona property and of the still-pending

---

[1] The Debtor testified that she dismissed the first case because she was attempting to resolve her default with the Bank directly through the Hardest Hit Fund and/or a COVID relief program. Her testimony was vague, but the Court finds that she dismissed the case on her attorney's advice to try to save the home outside of bankruptcy.

3

personal injury claim to the plan. By this time, the mortgage arrearage to be paid through the plan amounted to $107,662.40.

The Court has concerns about the rental income. No testimony was presented related to that income. The Debtor disclosed on Schedule G ("Executory Contracts and Unexpired Leases") in the third case that she has two-year tenant lease agreements with James Chapman and Steve McCarthy, both of whose addresses are listed to be the Mapleton home. On her Statement of Financial Affairs she disclosed that she earned $1,500 in rental income in 2022 and $8,000 in 2023. It thus appears that from at least December 2022 she has generated about $1,000 per month from the home that is the subject of this motion.

Despite that $1,000 per month income, the Debtor did not resume making her mortgage payments (estimated to be $1,329.68 per month) after filing the third petition. (She testified that she had not realized that she was responsible for making direct payments to the Bank, because in her previous plan she had paid through the Trustee in her monthly plan payments.) The Bank thus filed a motion for relief from the automatic stay in March 2024. That motion was resolved by an agreed repay order in which the Debtor agreed to make additional monthly payments. The proposed plan was confirmed without objection on May 16, 2024. The Bank notified the Court in late June that the Debtor had failed to adhere to the repay order and was again in default. In fact, the Debtor made only two payments totaling about $3,500 to the Bank while her third case was pending. The case was dismissed on the Trustee's motion for failure to make plan payments in July.

### D.    The fourth Chapter 13 case

The Bank returned to state court, and a sale of the residence was scheduled for September 11, 2024. Three weeks before the scheduled sale, the Debtor filed her fourth Chapter 13 petition in this case. On her schedules, she disclosed the same income from her third case with the addition of $400 per month in "possible income from Arts/crafts." Her Schedule I, which she testified is accurate, discloses monthly income of $4,516. The evidence does not support that figure. The Debtor did not substantiate the $400 in "arts/crafts" income through her testimony. Instead, she testified that she had begun working for DoorDash sometime after filing her third case and was now earning about $2,000 per month from that source.

The DoorDash testimony is troubling to the Court. First, the Debtor's testimony was conclusory and unsupported by documentary evidence. More importantly, she has never disclosed on her Schedule I, in either the third case (when she said she began

4

working for DoorDash) or in the fourth case (when she said was already working for DoorDash), that she receives *any* income from DoorDash. Yet her testimony was clear: "I know with [this fourth case] I reviewed everything [on the schedules]."[2] Although the Court believes the Debtor has earned *some* money through DoorDash—it would be odd to invent the job out of whole cloth—the Court cannot find by a preponderance of the evidence that the Debtor actually has earned $2,000 per month in income from DoorDash during the past year. The Debtor's testimony alone was not reliable or specific enough to support an income figure of $2,000 per month from DoorDash. (If indeed the Debtor makes $2,000 per month from DoorDash, failed to schedule that income, and then after reviewing the schedules certified under penalty of perjury that they were "true and correct," that is a bigger problem than this lift-stay motion.)

On the flip side, the Debtor's Schedule J understates her expenses. Though she indicates in the plan that her mortgage payment is $1,329.68, she deducts only $1,084 in home ownership expenses on Schedule J. Though she is in significant arrears on payments to her homeowners' association, no deduction for HOA fees appears on the schedule. Though she testified that she earns significant income from DoorDash—a delivery service—no deduction for transportation expenses or car insurance appears. Nothing is set aside for medical expenses, entertainment, or insurance. Other than the mortgage payment—which again, was understated by $250—the Debtor reports only $435 in monthly living expenses. In her previous cases, she had sworn that her non-mortgage monthly expenses totaled $1,195 (first case), $1,090 (second case), and $795 (third case). The $435 figure is not plausible, and the Debtor provided no testimony to support that unrealistic estimate of expenses.

Both Schedules I and J in this case are inaccurate. Because I is overstated and J understated, the net monthly income of $2,997 on Schedule J is also overstated. The expenses disclosed in the third case, even though they were lower than the first two cases, were at least plausible, in that they included transportation and car insurance expenses and described a more reasonable food expense ($455). The Debtor's testimony about her change in income between the third and fourth case was not credible given her failure to schedule or otherwise substantiate her DoorDash income. No other documentary evidence was introduced to support the Debtor's new numbers. The Court finds for purposes of resolving this motion that the Debtor's monthly net income is approximately $2,300, as averred in the third case. The Court also finds that the

---

[2] The Debtor's certainty about the schedules filed in this case was presented in contrast to her inability to recall what had happened in earlier bankruptcies.

5

Debtor inflated her monthly net income in an attempt to convince the Court that she could afford the substantial plan payment required to cure the arrearage on her home.

The Bank's proof of claim discloses that the Debtor is now in arrears to the tune of $118,729.80. She also owes $21,488 in past-due HOA fees. Her plan proposes to cure both arrearages over 60 months, and she proposes to make post-petition maintenance payments on the mortgage directly to the Bank. She has attempted one post-petition payment, but it was rejected for non-sufficient funds. She is currently in default on her post-petition obligations.

The Debtor cannot afford her plan as proposed. The arrearages alone require payments totaling $140,000 over five years. When you add Trustee and attorney fees, there is no chance the Debtor can make the plan work through monthly payments alone, given her net monthly income of $2,300.

So again, she has proposed selling the Arizona property, now valued at $50,000. She proffered a letter from a prospective buyer who intended to buy the property for that amount "at the beginning of next year." Doc. 43-5. She offered no testimony concerning the proffered letter, so it was not admitted into evidence and has not been considered in deciding this motion. Even assuming that she has a buyer lined up, however, the Court has no confidence that a sale would occur given the Debtor's history. She did not provide a satisfactory answer as to why it has taken over four years to sell the Arizona property. The Court understands that the Debtor endured a series of family deaths, including her daughter's tragic passing in January 2023. The Debtor testified that the consequences of her daughter's death "took over everything" in terms of finances and emotions through 2023, and the Court credits that testimony as far as it goes. Still, the Debtor first proposed selling the property in January 2020, and the plan confirmed in March 2022 required her to do so. So even were the Court to consider the proffered letter, it would still be unable to find by a preponderance of the evidence that the Debtor will actually sell the Arizona property in the near future and apply those funds to her plan. (As it is, the Debtor offered no testimony about the proposed sale, so she failed to carry her burden of proof on the matter.)

Because this is the second Chapter 13 petition filed within a year, the Debtor filed with the petition a motion to extend the automatic stay. That motion was denied at a hearing at which the Court assumed the truth of the Debtor's representations but concluded that those representations did not entitle her to relief. The automatic stay "with respect to the debtor" thus terminated on the 30th day after she filed this petition. 11 U.S.C. §362(c)(3)(A).

**II. The latest bankruptcy filing was part of a scheme to delay or hinder U.S. Bank.**

The filing of a bankruptcy petition operates as a broad stay of litigation, lien enforcement, and other actions, judicial or otherwise, that are attempts to enforce or collect prepetition claims. 3 Collier on Bankruptcy ¶ 362.01 (16th ed. 2024); 11 U.S.C. §362(a). With respect to a stay of an act against real property, a creditor with a security interest in the real property is entitled to relief from the stay

> if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved either—
>
> (A) transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or
>
> (B) multiple bankruptcy filings affecting such real property.

11 U.S.C. §362(d)(4). Once the creditor obtains relief from the stay under §362(d)(4), and assuming it records the order in compliance with State laws governing notices of interests or liens in real property, the order is effective for a period of 2 years in any bankruptcy case involving the property. *Id*.

It is uncontested that the Bank has a security interest in the Debtor's home and that she has filed multiple bankruptcy petitions affecting that real property. The question is whether this last petition was part of a "scheme to delay, hinder, or defraud" the Bank. That phrase was added to §362 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23 (2005), in order to "reduce abusive filings." H.R. Rep. No. 109-31(I), at 70 (2005).

> **A. A scheme to delay or hinder does not require an intent to defraud, but it does require an unlawful intent.**

Section 362(d)(4)'s language combines two phrases already known at law. The Criminal Code has for many years proscribed "schemes" to defraud. E.g., 18 U.S.C. §§157, 1341. Meanwhile, the Bankruptcy Code has from its inception (1) denied a discharge for a debtor who renders property unavailable "with intent to hinder, delay, or defraud a creditor," 11 U.S.C. §727(a)(2); and (2) permitted the trustee to avoid prepetition transfers made "with actual intent to hinder, delay, or defraud any entity," 11 U.S.C. §548(a)(1)(A). Congress in BAPCPA also added a limitation on the homestead exemption relating to a debtor's "intent to hinder, delay, or defraud a creditor." 11

7

U.S.C. §522(o). Each of those three provisions owes its language to the Fraudulent Conveyances Act of 1571 (13 Eliz. 1. c. 5), which prohibited transfers made with "intent to delay, hinder, or defraud creditors and others."

Because §362(d)(4) borrows old common law and statutory terms, Congress presumably meant to adopt the "cluster of ideas that were attached to each borrowed word"; obviously transplanted language "brings the old soil with it." *Sekhar v. United States*, 570 U.S. 729, 733 (2013). The Court therefore discerns the meaning of "scheme" and "delay, hinder, or defraud" using the law's longtime understanding of those terms. See, e.g., *In re Addison*, 540 F.3d 805, 811 (8th Cir. 2008).

### 1.  A "scheme" carries no negative connotation by itself.

A "scheme" is a "plan or course of action formed with the intent to accomplish some purpose." William J. Bauer Criminal Jury Instructions of the Seventh Circuit 624 (2023 ed.); see *United States v. Thomas*, 986 F.3d 723, 730 (7th Cir. 2021) ("A scheme is a 'continuing course of conduct, during a discrete period of time.'"). The word "scheme" carries a negative connotation in colloquial use, but the law treats it as a synonym for "plan." E.g., 11 U.S.C. §101(53D) (defining 'timeshare plan' to mean and include interest purchased in "any arrangement, plan, scheme, or similar device"). No doubt the ubiquity of the phrases "scheme to defraud," "Ponzi scheme," and "pyramid scheme" helps inform the American ear that a scheme involves cunning or deceit. See *In re Abdul Muhaimin*, 343 B.R. 159, 167 (Bankr. D. Md. 2006). But it is the object of the scheme that drives that meaning, not the word "scheme" itself.

Other courts have defined the term "scheme" to mean an "intentional artful plot or plan." *Palladino v. HSBC Bank USA, N.A.*, 502 F. Supp. 3d 1336, 1341 (N.D. Ill. 2020). That definition stems not from judicial interpretations of the term "scheme" but from a dictionary. See *In re Smith*, 395 B.R. 711, 719 n.22 (Bankr. D. Kan. 2008). Relying on one particular dictionary definition to add color to a well-known legal term is not a good way to interpret statutes. See *Suesz v. Med-1 Solutions, LLC*, 757 F.3d 636, 643 & n.3 (7th Cir. 2014). Courts have seized upon the "artful plot" language from the dictionary to conclude that a scheme must involve some sort of cunning or craftiness. E.g., *Smith*, 395 B.R. at 719 (denying creditor's motion when debtor was "more of a plodder than a plotter."). Anyone familiar with schemes to defraud knows, though, that the least clever among us may still violate the mail and wire fraud statutes; "the range of potential schemes is as broad as the criminal imagination." *United States v. Bonansinga*, 773 F.2d 166, 173 (7th Cir. 1985). Schemes require intentional, not necessarily artful, plans. *United States v. Coffman*, 94 F.3d 330, 333 (7th Cir. 1996). The Seventh Circuit's pattern jury instruction correctly recites the law: a scheme is simply a plan or course of action

8

formed with the intent to accomplish some purpose. Under §362(d)(4), that purpose must be to delay, hinder, or defraud creditors.

### 2. Acting with intent to "delay, hinder, or defraud" involves actual fraud.

What does it mean to act with the intent to delay, hinder, or defraud creditors? If we were starting anew, we might separately define each of the terms—delay, hinder, and defraud—to discern their individual meanings. But this is an ancient phrase that defies that sort of "plain meaning" approach to statutory interpretation. *In re Duncan & Forbes Development, Inc.*, 368 B.R. 27, 34 n.12 (Bankr. C.D. Cal. 2006). The phrase "has always been held to require … that there shall be actual fraud." *Coder v. Arts*, 213 U.S. 223, 242 (1909). And "actual fraud" involves moral turpitude or intentional wrong. *Husky Intern. Electronics, Inc. v. Ritz*, 578 U.S. 355, 360 (2016). So the question is "whether the act done is a bona fide transaction"; a good faith transfer is not made with the intent to hinder or delay "notwithstanding the effect may be that it hinders or delays creditors by removing from their reach assets of the debtor." *Coder*, 213 U.S. at 243; see also, e.g., *Hefner v. Metcalf*, 38 Tenn. 577, 579 (1858) ("The words 'hinder and delay' are to be taken in their legal or technical, and not their literal sense …. The statute only refers to an improper or illegal hinderance or delay—not such as is reasonable and fair in the exercise of the well established right to prefer creditors."); *Dance v. Seaman*, 52 Va. 778, 782 (1854) (rejecting literal meaning, because "[e]very conveyance to trustees interposes obstacles in the way of the legal remedies of the creditors, and may, to that extent, be said to hinder and delay them.").

Perhaps because the phrase requires an intentional wrong, some courts treat the phrase as requiring an intent to defraud. That view is understandable; in most cases, the phrase is implicated when someone has acted with such intent. For fraudulent conveyances, the "intent to hinder, delay, or defraud" typically refers to the intent "to hide assets from creditors by giving them to one's family, friends, or associates." *Husky Intern. Electronics*, 578 U.S. at 361. An intent to delay, hinder, or defraud may be found in a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly adequate consideration—so called "badges of fraud." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 541 (1994). The Eighth Circuit treats the phrase as a unified whole that typically requires an intent to defraud. *Addison*, 540 F.3d at 811; *In re Johnson*, 880 F.2d 78, 79 n.1 (8th Cir. 1989). Other courts similarly treat the language as a stock phrase rather than one comprising three individual verbs. E.g., *In re Wrobel*, 508 B.R. 271, 281 (Bankr. W.D.N.Y. 2014) ("[T]he phrase 'hinder, delay or defraud' is a statutory whole, not to be parsed and severed to a point of absurdity.").

9

The majority of courts correctly recognize that there is a distinction between an intent to delay or hinder and an intent to defraud, though. *Matter of Wiggains*, 848 F.3d 655, 661 (5th Cir. 2017). A debtor may be ineligible for a discharge under §727(a)(2) if he acted with intent to hinder or delay, even if he had no intent to defraud. *Matter of Smiley*, 864 F.2d 562, 568 (7th Cir. 1989). That conclusion is consistent with Supreme Court precedent. *Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932). As the Seventh Circuit long ago noted:

> Creditors are entitled not only to be paid, but to be paid as their claims accrue, and a debtor has no more right to postpone payment simply for his own advantage than to defeat it altogether. A purpose to hinder and delay a creditor is, therefore, fraudulent, although the debtor may honestly intend that all his debts shall ultimately be paid.

*Cook v. Ball*, 144 F.2d 423, 431 (1944). So this Court must construe the statutory phrase in the disjunctive.

The history of §362(d)(4) requires that result as well. Earlier it was mentioned that §362(d)(4)'s language was enacted as part of the 2005 BAPCPA amendments to the Bankruptcy Code. That was not precisely correct; in BAPCPA, Congress conditioned relief on a showing that debtor filed the petition as part of a scheme to "delay, hinder, *and* defraud" the creditor. A number of bankruptcy courts denied creditor motions under that conjunctive standard, for though petitions had caused delays they were not filed with an intent to defraud. 3 Collier on Bankruptcy ¶ 362.05 (16th ed. 2024) (citing cases). Congress responded by revising the text, which now requires a scheme to "delay, hinder, *or* defraud" the creditor. Bankruptcy Technical Corrections Act of 2010, Pub. L. 111-327, 124 Stat. 3557, 3559 (2010). That revision makes it clear that a creditor need not show a debtor's intent to defraud to secure relief under §362(d)(4). *In re Tejal Inv., LLC*, No. 12-28606, 2012 WL 6186159, at **5, 7 (Bankr. D. Utah 2012).

Still, there must be an unlawful intent. A debtor who structures his assets to take advantage of bankruptcy exemptions, within the limits of the law, does not act with the proscribed intent, even if his actions have the effect of hindering his creditors. *Smiley*, 864 F.2d at 567. The debtor must instead commit "some act extrinsic" to that planning that hinders, delays, or defrauds. *Id.*; accord *In re Braus*, 248 F. 55, 64 (2d Cir. 1917); *Duncan & Forbes Development*, 368 B.R. at 34. This Court believes the Seventh Circuit would agree that the proscribed intent depends upon what is "reasonable and fair" in context. See *Hefner*, 38 Tenn. at 580. Acting with the intent to deprive creditors of their rights under the Bankruptcy Code would certainly qualify. Cf. *Dean v. Davis*, 242 U.S. 438, 444 (1917).

10

### B. A scheme to delay or hinder may be found under §362(d)(4) when a petition is filed in violation of the Bankruptcy Code.

Many Chapter 13 petitions are filed expressly with the intent to "save the home." The automatic stay operates to halt foreclosure proceedings, and the provisions of §1322 permit a debtor to cure her default, maintain monthly mortgage payments, and emerge from bankruptcy in good standing with her creditor. Every "save the home" petition has the effect of delaying a foreclosing creditor; that is the very point of filing the petition. For a petition to be filed as part of a plan involving improper intent, something beyond availing oneself of one's legal rights must be present. See *Smiley*, 864 F.2d at 567. A debtor who complies with the Bankruptcy Code to try to save her house hardly acts with an improper intent. *Matter of Lisse*, 921 F.3d 629, 639 (7th Cir. 2019).

Not every debtor who files a "save the home" petition complies with the Code, however. Consider the following example: "Only an individual with regular income … may be a debtor under chapter 13." 11 U.S.C. §109(e). And an individual whose prepetition bad-faith conduct would provide "cause" to dismiss or convert a Chapter 13 case under 11 U.S.C. §1307(c) is similarly ineligible to be a debtor. *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 372–74 (2007). An individual who files a petition despite being ineligible to be a debtor has acted unlawfully, which may support a finding that he filed with an improper intent to delay. Many other examples may be imagined. E.g., *In re Dorsey*, 476 B.R. 261, 266 (Bankr. C.D. Cal. 2012) (describing unlawful "property dumping"). Broadly speaking, an improper intent to hinder or delay may be found when the debtor does not comply with relevant law. Cf. *In re Sentinel Management Group, Inc.*, 728 F.3d 660, 668 (7th Cir. 2013) (emphasizing the debtor's *unlawful* acts).

Filing in bad faith—an act that is an abuse of the bankruptcy process, *Marrama*, 549 U.S. at 374—is usually the unlawful act relied upon to support a finding that the petition was filed with an improper intent to hinder or delay. E.g., *In re Garcia*, No. 22 B 130, 2022 WL 665825, at *6 (Bankr. N.D. Ill. 2022); *In re Mendiola*, 573 B.R. 758, 764 (Bankr. E.D. Wis. 2017); *In re Macaulay*, No. 11-07382-DD, 2012 WL 2919154, at *3 (Bankr. D.S.C. 2012); see *In re Olayer*, 577 B.R. 464, 468–69 (Bankr. W.D. Pa. 2017); *In re Taal*, 520 B.R. 370, 378 (Bankr. D.N.H. 2014).

### C. The Debtor filed the petition in this case as part of a scheme to delay or hinder U.S. Bank.

The Debtor filed this petition as part of a scheme to delay or hinder the Bank that involved multiple bankruptcy filings affecting her home. She intended the delay; she

11

admitted as much when she testified that she filed each petition to "save the home" from foreclosure. Even without her admission, the timing of each of the four petitions clearly establishes that her bankruptcies were intended to delay foreclosure proceedings. The question therefore is whether her intent to delay was improper. The Bank argues it was: the Debtor's "past behavior exhibits an intent to continually file subsequent Chapter 13 petitions … with neither the intent and/or ability to maintain a successful Chapter 13 Plan." In other words, it argues, the Debtor has acted in bad faith in filing this latest petition.

Determining whether a petition was filed in bad faith requires a fact-intensive determination under the totality of the circumstances. *Matter of Love*, 957 F.2d 1350, 1355 (7th Cir. 1992). This Court must examine "whether or not under the circumstances of the case there has been an abuse of the provisions, purpose, or spirit" of Chapter 13; the focus of the good faith inquiry is "often whether the filing is fundamentally fair to creditors and, more generally, is the filing fundamentally fair in a manner that complies with the spirit of the Bankruptcy Code's provisions." *Id*. at 1357. Both objective and subjective evidence is relevant. *Id*. Relevant factors depend on the case, but may include the nature of the debt, the timing of the petition, how the debt arose, the debtor's motive in filing the petition, how the debtor's actions affected creditors, the debtor's treatment of creditors both before and after the petition was filed, and whether the debtor has been forthcoming with the bankruptcy court and the creditors. *Id.*

The Bank bears the burden of proving the statutory requirements have been met. *Garcia*, 2022 WL 665825, at *5. That is only an initial burden, though; once it has met the burden by making out a prima facie case, the ultimate burden of proof rests with the party opposing stay relief—here, the Debtor. *Id*.; 11 U.S.C. §362(g)(2). As explained below, the Bank has met its initial burden of establishing that the latest petition was filed as part of a scheme to delay or hinder the Bank. The Debtor has failed to shoulder her burden of proving otherwise, so the Bank is entitled to relief.

The main problem in this case, as the Bank repeatedly points out, is that the Debtor is too far in arrears to afford the cure permitted by the Bankruptcy Code. She cannot afford to pay the arrearage based on her monthly income alone, and she has been delinquent in selling the Arizona property, the proceeds of which could be applied to the arrearage. Nothing in the evidence presented to the Court shows that the Debtor has a viable path towards overcoming those problems.

In fact, in an effort to bolster her apparent ability to pay, the Debtor falsely inflated her net monthly income in her schedules and testimony. Her monthly living expenses of $435 are unreasonably low and inconsistent with the expenses she disclosed

in her prior three cases. She testified that in fact she had not reviewed the Schedule J (expenses) filed in her first case, which listed reasonable monthly living expenses of $1,195, and that the schedule was in fact inaccurate. The Court does not credit that testimony; it finds that the Debtor testified as such to make her current Schedule J appear more reasonable. Meanwhile, the Debtor has never disclosed on her schedules or provided documentary proof of her income from DoorDash, even though she claims to be making $2,000 per month. The Debtor has purposely attempted to inflate her net monthly income in this case to make it appear as if she can afford to cure the sizeable arrearage on her residence. See 11 U.S.C. §1325(a)(6). That lack of candor or completeness in filing schedules is an indication of bad faith. *In re Jakovljevic-Ostojic*, 517 B.R. 119, 127 (Bankr. N.D. Ill. 2014).

      The Debtor has not convinced the Court that she intends to succeed where she has failed before in selling the Arizona property. She testified that she first decided the sell the Arizona property in her second case. That testimony was not credible. She in fact proposed to sell the property in the plan she filed in her first case, and the Court does not believe her testimony that she did not review the pleadings in that case. Instead, her testimony was designed to make her failure to sell the property seem more excusable by making it seem as if she has had only a couple years to sell. The Debtor has known of the need to sell the Arizona property since early 2020 to cure the arrearage on her home through the Bankruptcy Code. Her attempt to deflect responsibility on that issue undermines her credibility generally.

      The Debtor's failure to sell the Arizona property in the second and third cases tends to show that she does not intend to do so in this case. The Debtor was required by a binding confirmation order, 11 U.S.C. §1327(a), to sell the property and apply the proceeds to the plan. It is unclear to the Court why the property was not sold. It appears that the Debtor took some efforts to prepare the property for sale but those efforts were impeded by family tragedies. No evidence supports a finding that external factors limited the Debtor's ability to sell the property, such as a lack of buyers or unfavorable market conditions. Instead, she simply decided not to take the time to sell it. That decision may be understandable from a human point of view. The Court credits the Debtor's account that the tragedy of losing her mother and her daughter diverted her attention from her bankruptcy plan obligations. But the decision has legal consequences, because under the law she has no more right to postpone her obligation to cure the arrearage under the plan for her own needs than to ignore the plan altogether. See *Cook*, 144 F.2d at 431. It has practical consequences, too; had she sold the property, her arrearage would be much lower and perhaps curable in this case. Instead, the Debtor hindered and delayed the Bank by failing to sell the Arizona property at any point from 2022 and 2024 despite two confirmation orders requiring her to do so. The

13

Court has no confidence that she would adhere to a third confirmation order that requires her to sell the property, and she provided no testimony supporting her plan to do so.

The Debtor's plan cannot be confirmed. Projections of the income necessary to finance a Chapter 13 plan must be concrete, not speculative. *In re Heath*, 649 B.R. 313, 319 (Bankr. N.D. Ill. 2023). The Debtor's monthly net income is insufficient to fund the plan, as explained above, and the Debtor's ability or willingness to sell the Arizona property is speculative. The plan thus cannot be confirmed under §1325(a)(6). Strategically timing a bankruptcy to stay or cancel foreclosure proceedings, as the Debtor did here, evokes bad faith when a debtor lacks the ability or intention to reorganize. *Olayer*, 577 B.R. at 469.

More broadly, the Debtor's payment history demonstrates a lack of good faith in adhering to her obligations to the Bank. It is one thing for an honest but unfortunate debtor to fall behind on her obligations. It is another to engage in a pattern of nonpayment followed by unsuccessful bankruptcy filings. In early 2020, the Debtor made every monthly payment on the mortgage, because she was in bankruptcy. As soon as her first case was dismissed, though, she stopped paying the Bank for over a year. During the pendency of her second case, when she was paying the Bank through the plan, she made only about a third of her plan payments; and as soon as that case was dismissed, she stopped paying the Bank. During the third case, she did not start making payments on the mortgage until the Bank filed a motion for relief from the stay.

Moreover, the Debtor disclosed that she has been earning $1,000 in monthly income from tenants who reside at the home since at least December 2022; yet in that time she stopped making plan payments and stopped paying the mortgage. The Debtor does not lack the means to make good-faith payments to the Bank. The Court infers from the Debtor's payment history that she has intentionally delayed or hindered the Bank by not making payments on the debt until she is forced to do so by an imminent foreclosure sale or a motion for relief from the stay. See *Mendiola*, 573 B.R. at 765 (finding abuse of system when debtor repeatedly defaulted on terms of mortgage and failed to make plan payments).

The Debtor's fourth bankruptcy petition is part of that pattern of delay. Filed three weeks before the foreclosure sale, the petition contains inaccurate information on the schedules in support of a plan that cannot be confirmed. After the Court denied her motion to extend the stay with respect to her, 11 U.S.C. §362(c)(3), and after the Bank filed this motion for relief from the stay with respect to the property, *id*. §362(d)(4), the Debtor filed a motion to dismiss the case, an act the Code deems abusive, *id*. §109(g)(2).

The Court thus concludes that the Debtor did not file this case as a good faith effort to reorganize her debts. Instead, it is apparent that this petition is the last attempt in a yearslong effort to delay or hinder the Bank in enforcing its rights under both bankruptcy and nonbankruptcy law. The petition abuses the provisions, purpose, and spirit of Chapter 13, and it is fundamentally unfair to the Bank, which has been paid over nearly five years now a grand total of $63 towards the Debtor's default of $119,000.

Because the petition was filed as part of the Debtor's scheme to delay or hinder the Bank, the Bank is entitled to *in rem* stay relief with respect to the Debtor's residence. The Bank's motion will be granted by separate order.

# # #